Patricia Peden (Bar No. 230440)
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| Timothy and Patricia Peden<br>　　　Plaintiffs,<br><br>v.<br><br>Mark Whitney d/b/a Whitney Homes<br>　　　Defendant. | Case No. _____<br><br>**COMPLAINT FOR**<br><br>**1) THEFT (PENAL CODE § 484b);**<br>**2) FRAUDULENT MISREPRESENTATION;**<br>**3) FRAUDULENT CONCEALMENT;**<br>**4) STATUTORY FRAUD;**<br>**5) VIOLATION OF CONSUMERS LEGAL**<br>　　**REMEDIES ACT;**<br>**6) UNFAIR BUSINESS PRACTICES;**<br>**7) CIVIL RICO (18 U.S.C. § 1962(c));**<br>**8) MONEY HAD AND RECEIVED/UNJUST**<br>　　**ENRICHMENT;**<br>**9) DECLARATORY RELIEF AND**<br>　　**RESTITUTION.**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Timothy Peden and Patricia Peden (together, "Plaintiffs" or "the Pedens") allege as follows against Defendant Mark Whitney, doing business as Whitney Homes ("Whitney" or "Defendant"):

## INTRODUCTION

1.    Plaintiffs bring this action for damages and equitable relief arising from Whitney's misappropriation of construction funds, fraudulent misrepresentation, concealment of material facts, diversion of funds specifically earmarked for third-party services, violations of California's home improvement contract laws, and violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).

2.    The Pedens seek recovery of all money paid to Whitney for the construction phase of their retaining wall project, including advance payments and payments for third-party services that were never paid over to the vendors, as well as treble damages and attorney's fees.

## JURISDICTION AND VENUE

3.    This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs assert claims arising under RICO, 18 U.S.C. §§ 1961-1964.

4.    This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims arise from the same nucleus of operative fact as the federal RICO claim, are based on the same operative facts regarding Whitney's misappropriation of funds, diversion of third-party payments, and use of wire and mail communications, form part of the same case or controversy, and do not require an independent basis of subject-matter jurisdiction.

5.    Supplemental jurisdiction over the related state-law claims promotes judicial economy and consistency in resolving all claims between the parties.

6.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant resides and regularly transacts business in Sonoma County, California, which lies within this District.

7.    Venue is also proper because a substantial part of the events and omissions giving rise to the claims, including the alleged misconduct, fraud, misappropriation, and wire and mail communications in furtherance of the scheme, occurred in Sonoma County, California, within this District.

///

**PARTIES**

8.      Plaintiffs Tim and Patricia Peden are individual owners of real property located in Sonoma County, California, for which they hired Whitney to perform home improvement work.

9.      Defendant Mark Whitney is an individual doing business as Whitney Homes. Whitney operates as a licensed general contractor in California, with license number 434267.  At all times relevant to this complaint, Whitney was subject to California's home improvement contract laws and contractor statutes.

10.     Whitney operates his contracting business in Sonoma County, California and has regularly conducted business and transactions affecting interstate commerce.  Whitney's business operations utilize interstate commerce, specifically through the regular use of interstate banking and credit card systems and the consistent use of interstate wires or mails.

**FACTUAL ALLEGATIONS**

**A.      The Pre-Construction Phase**

11.     In approximately April 2023, the Pedens and Whitney Homes entered into a preconstruction agreement for the design and engineering of a retaining wall to be built on the Pedens' property in Guerneville California.

12.     Whitney Homes' responsibilities were clearly defined: they were to design the retaining wall and undertake all necessary work to obtain the required building permits.  The scope of work was limited.  The Pedens informed Whitney of their intention to seek competitive bids for the actual construction of the retaining wall once permits were secured. Mark Whitney confirmed his understanding and acceptance of this limited scope, stating he had no objection to restricting his company's work to the design and obtaining all necessary permits for the retaining wall.

13.     The preconstruction agreement did not authorize Whitney to construct the retaining wall, to collect advance payments for construction materials or labor, or provide for Whitney to receive any progress payments.

14.     Whitney's preconstruction and design services were subpar, and subject to delays and cost overruns. Despite this, the Pedens paid all invoices for the pre-construction work.  In this complaint, the Pedens do not assert claims or seek damages arising from the preconstruction agreement.

**B.    Failed Negotiation for a Written Construction Contract**

15.    Starting in December of 2023, the Pedens sought bids for the construction of the retaining wall.  However, when they contacted several contractors for bids, those contractors reported that the wall designed by Whitney Homes required significant revisions due to fundamental flaws.  Unable to find a contractor willing to build the wall Whitney designed, the Pedens contacted Whitney to discuss the possibility of retaining Whitney Homes to build the retaining wall.

16.    The Pedens and Whitney attempted to negotiate a written home improvement contract for the construction phase of the project.  The Pedens would not agree to Whitney's terms.  On March 29, 2024, the parties' attempts to negotiate a written contract came to a close.  The Pedens hired a different contractor, and their work with Whitney Homes ceased.

**C.    Construction Phase Commenced Based on Incremental Change Orders**

17.    Whitney Homes's submission of deficient plans led to their rejection by Sonoma County's permitting department. This failure to secure the necessary permits, and the resulting prolonged back-and-forth with the County to correct the documents, caused significant delays and serious consequences for the Pedens. Directly resulting from the inability to obtain timely approval, the Pedens were forced to forfeit their scheduled contractor time slots. This placed the Pedens in an urgent and difficult predicament: they needed a retaining wall to prevent further damage to their home, but their insurance company threatened policy cancellation if the necessary repairs were not completed soon.

18.    Because Whitney Homes' failure to secure the necessary building permits caused construction delays, the Pedens requested Whitney provide a list of potential contractors in January 2025. Instead of recommending contractors, Whitney responded that he "would be more than happy to revisit the scope of work & cost should you want to entertain that idea…"  Whitney Homes knew the Pedens would not agree to the terms of the prior written contract he had proposed, as the Pedens had already refused those terms.  Nonetheless, Whitney sought to secure the project without a written contract.

19.    In January and February of 2025, during discussions regarding Whitney potentially serving as the general contractor for the project, Mark Whitney assured the Pedens that the work would be executed by "his own team."  For work that would be outside Whitney's "team," Whitney represented

that he would leverage his longstanding, pre-existing relationships with subcontractors to secure the highest quality work at the most favorable price. Importantly, Whitney also represented and promised that all subcontractor invoicing would be completely transparent, and that all suppliers, vendors and subcontractors would be paid promptly. Similar assurances are publicly available on the Whitney Homes website at

https://whitneyhomes.com/best-qualities-to-look-for-general-contractor-santa-rosa-ca/. Each of these statements was false, and Whitney knew they were false at the time he made them. Had the Pedens known that Whitney's statements were false, they would not have continued to do business with him.

20.     The Pedens expressly informed Whitney that prompt payment and transparent terms for third-party vendors and subcontractors were material conditions that factored into their decision to hire Whitney Homes. In response, Whitney assured the Pedens that he would provide transparent invoicing and timely pay all expenses incurred for the project.

21.     Whitney Homes' work was documented through a series of approved incremental change orders. These change orders were not incorporated into any comprehensive written home improvement contract meeting the requirements of Business and Professions Code § 7159, and functioned as ad hoc authorizations for incremental work rather than a complete contract with statutory disclosures, payment schedules, and terms.

22.     At no time did the parties execute a written agreement containing comprehensive contract terms governing the construction work. The Pedens never agreed, orally or in writing, that Whitney would earn progress payments. All advance payments made to Whitney Homes were to be used to pay third-party vendors, subcontractors, and/or to secure materials needed for the project. Whitney Homes was not entitled to take any profit for its work until the project was complete and a full release from any potential mechanic's lien claims was provided from all subcontractors and material suppliers.

### D.     Whitney's Fraudulent "Draw" Payment Demands

23.     Early in the construction phase, Whitney demanded advance "draw" payments, ostensibly for the purchase of materials needed for the retaining wall project. In telephone conversations, Whitney represented to the Pedens that the draw payments would be used to purchase project materials and

pay for services required to construct the retaining wall.

24.     Whitney conditioned moving forward with the project on receiving these demanded payments. Any time the Pedens questioned his request for funds, Whitney threatened to halt the project until his demands were met. Whitney intentionally exploited the Pedens' urgent need for the work and the potential harm from delay, leveraging their time pressure to secure advanced payments. These payments were not permitted under the parties' agreement or the mandatory California statutes governing Whitney's work. There was no contract authorizing Whitney Homes to take advance payments, and Business and Professions Code § 7159.5(a)(3) limits down payments to the lesser of $1,000 or 10 percent of the contract price, while § 7159.5(a)(5) prohibits contractors from requesting or accepting payment that exceeds the value of work performed or materials delivered.

25.     Notwithstanding these statutory limits, Whitney demanded and received $65,000 in "draws" for project expenses from the Pedens, who, relying on Whitney's representations, paid via wire transfers and mailed checks.  The Pedens paid $50,000 in response to a demand for payment in invoice 11.  Payment was made in two equal installments on March 5 and 17, 2025 (personal check). The Pedens paid $10,000 demanded by Whitney in invoice 15 (personal check) on April 24, 2025. The Pedens paid $5,000 on May 17, 2025 in response to invoice 16 (personal check).

26.     On July 27, 2025, Whitney issued invoice 22, demanding an additional $5,000 for materials and threatening to halt the project if payment was not made. The Pedens refused, telling Whitney that the total amount already paid was sufficient to cover upcoming material expenses, especially since work on the wall had not yet begun.  Crucially, at the time Whitney demanded this payment, he knowingly concealed from the Pedens that he already possessed a total of $93,840 of their money ($65,000 intended for material draws and not dispersed for that purpose, plus $28,840 that had been paid for third-party providers and vendors but was instead misappropriated).

27.     Whitney did not use the $65,000 to purchase project materials, the materials remain unpurchased, and the project work for which the materials were allegedly needed was never completed.  Whitney has refused and continues to refuse to return any portion of the $65,000 to the Pedens.

///

**E.    Whitney's Fraudulent Invoicing and Diversion of Third-Party Payments**

28.    Whitney presented invoices to the Pedens for work and services performed by specific third-party contractors and vendors. The Pedens paid numerous invoices for third-party services, totaling $30,930.00 via wire transfer and mailed checks, in reliance on Whitney's representations that the third parties would be paid from those funds.

29.    The specific invoices for which Whitney represented payment was to be made to a third party, collected money from the Pedens to pay the third party, and then failed to pay the third party, concealing the fact that the money received was not paid but rather kept by Whitney include the following:

a.    *Whitney misappropriated funds intended for RGH Consultants.*

Whitney Homes issued invoice No. 3, for $9,840.00.  The invoice is for payment to pay for an engineering soil report prepared by RGH Consultants. The invoice specifically names RGH as the provider of the services for which payment was due. The Pedens paid this invoice, specifically for RGH's services, in four payments:  May 2, 2023 for $3000.00 (online credit card payment); June 15, 2023 for $3,000 (online credit card payment); July 4, 2023 for $2,200.00 (online credit card payment); and December 14, 2023 for $1,640.00 (personal check).  The balance was paid in full by December 14, 2023. Whitney demanded these payments from the Pedens representing that he needed to pay RGH. Despite being in possession of the Pedens' funds for this express purpose for two years, Whitney never paid RGH, and RGH is still owed the full balance.  Whitney concealed his non-payment from the Pedens.

b.    *Whitney misappropriated funds intended for Hogan Land Services.*

Invoice numbers 4, 9 and 12, totaling, $5,160.00, were for services provided by Hogan Land Services. The invoices specifically name Hogan as the provider of the services for which payment was due. The Pedens paid invoice 4 in several payments; a May 26, 2023 payment for $1,000 (personal check); an October 2, 2023 payment for $900.80 (personal check), and a December 14, 2023 payment for $475,20 (personal check).  The Pedens paid invoice 9 for $804.00 on Feb. 20, 2025 (personal check).

The Pedens paid invoice 12 for $2,039.20 on March 4, 2025 (online credit card payment). Despite these payments, Whitney did not pay Hogan, and he concealed his non-payment from the Pedens.

c.    *Whitney misappropriated funds intended for Cordoza Concrete.*

Invoice No. 14, totaling $5,500, was for tree removal services provided by Cordoza Concrete. Whitney demanded payment from the Pedens by falsely claiming he needed to pay Chris Cordoza, who was demanding payment. The Pedens paid invoice 14 in full on April 24, 2025 via personal check. Despite receiving the Pedens' money for the express purpose of paying Cordoza, Whitney instead converted $4,000.00 of the collected funds to his own use and actively concealed the conversion from the Pedens.

d.    *Whitney misappropriated funds intended for Delta Rebar Service Inc.*

Whitney Homes submitted Invoice No. 20, totaling $30,308, for rebar cages to be used in the retaining wall project. Whitney falsely claimed to the Pedens that the then-unknown supplier of the rebar cages, Delta, required half payment upfront. Whitney insisted that the project would be delayed unless the Pedens promptly paid half of the invoice price. Consequently, on June 29, 2025, the Pedens paid Whitney Homes $15,000 by check, specifically for the purpose of satisfying Delta's purported demand for advance partial payment. Whitney, however, misrepresented both the amount required by Delta and its payment terms. Delta never demanded partial payment in advance. Despite receiving these funds for the express purpose of paying Delta, Whitney converted the full $15,000 to his own use and actively concealed this conversion from the Pedens. The Pedens did not learn of Whitney's deception until they spoke with Delta on December 19, 2025.

30.    Whitney collected payments from the Pedens rerepresenting that he was collecting the money to pay the third party vendors and suppliers. Witney, however, did not pay the identified third parties, and instead diverted the funds to other uses and retained the money for himself.

31.    To effectuate his fraudulent scheme, Whitney used interstate wire and mail systems, including email and electronic communications transmitting invoices to the Pedens, instructions to send funds

to Whitney via an online payment program that would deposit funds into his bank account, mailed checks sent by the Pedens in payment of invoices and draws, electronic transfers documenting receipt of funds, and written and electronic communications falsely assuring that third parties were to be paid from the funds the Pedens sent to Whitney.

32.     Each wire transfer and each mailed check, combined with false invoices and misrepresentations, constituted an act in furtherance of Whitney's fraudulent scheme and a predicate act of wire or mail fraud.

### F.      The Pedens Discover Whitney's Theft and Fraud

33.     On or around October 4, 2025, Whitney Homes submitted change order 19.  In the change order, Whitney sought immediate payment of $9,600.00 for future services to be performed by RGH. The change order stated that the fees were for a "foundation review letter" and related inspections. Whitney told the Pedens that RGH demanded full payment in advance.  Whitney represented that immediate payment was necessary because the letter RGH needed to write was required to secure the county's approval to move forward with the project.  Whitney told the Pedens that if they did not advance the money he demanded, the project could not proceed.  In response to Peden's repeated questions about RGH's seemingly unreasonable demands, Whitney said that the matter was outside his control.  Whitney did not disclose to the Pedens, and in fact concealed, that he did not pay RGH the money the Pedens paid him for their services in 2023.  Nor did Whitney disclose to the Pedens that his non-payment for work RGH completed two years ago was the reason for RGH's prepayment demands.

34.     Concerned with the amount of the invoice, nearly $10,000 for a letter, and the immediate demands for payment, and having received no answers from Whitney, the Pedens contacted RGH directly.  On November 5, 2025, Ms. Peden spoke with RGH's Jared Pratt.  Mr. Pratt informed Ms. Peden that RGH's general practice is to issue invoices only after its work had been completed, but that it was insisting on a prepayment from Whitney because Whitney had not paid RGH the $9,840.00 for a soil report it prepared.  The Pedens had paid Whitney for that work, in full, by December 2023, nearly two years prior.  This was the first time the Pedens learned that Whitney had misappropriated construction funds.

35.    After speaking with RGH, the same day, Ms. Peden contacted Hogan Land Services.  She discovered that Mark Whitney had also withheld funds the Pedens paid Whitney for the Hogan invoices. Similar to RGH, Hogan was now refusing to perform further work on the project without prepayment. Hogan's services were necessary before construction could begin, meaning the project was stalled due to non-payment.  In making his demands that the Pedens immediately make prepayments for Hogan's work, Whitney concealed from the Pedens that he had failed to pay Hogan with the money the Pedens had paid him for that specific purpose.  Thereafter, Ms. Peden obtained a complete list of outstanding Hogan Land Services invoices and found that Whitney had billed the Pedens for amounts exceeding what Hogan had actually charged.

36.    The same day, Ms. Peden called Chris Cordoza of Cordoza Concrete.  She learned that Whitney had also pocketed $4,000 dollars of the money the Pedens paid specifically for Cordoza's work.  Mr. Cordoza reported that he had made repeated efforts to get payment from Whitney Homes but was ignored.  The Pedens also learned that Cordoza had never before worked with Whitney Homes and was not a subcontractor with whom Whitney had a long-standing preexisting relationship as previously represented.  Mr. Cordoza reported that he would not work with Whitney in the future, citing non-payment and apparent lack of competence, telling Ms. Peden that "[Mark Whitney] has never before held a hammer" and was instructing work that fell below industry standards.

37.    The following month, after terminating Whitney's services, the Pedens learned of additional non-payments.  For months, Whitney refused to tell the Pedens who he hired to construct rebar cages for the project.  After they fired Whitney, the Pedens repeatedly asked for the name of the rebar cage supplier so they could communicate Whitney's termination and discuss the status of the work.  Whitney refused to identify the supplier, although the Pedens had prepaid for its work.  On December 16, 2025, Whitney told the Pedens that he would not disclose the name of the vendor because "under the circumstances, we [Whitney Homes] need to work with all subs/vendors under our direction. . ." When the Pedens explained that Whitney had been fired and was no longer working with project vendors, and that he could not both keep the money for the rebar cages and also refuse to tell the Pedens where they could take possession of the same cages, he finally disclosed the name of the supplier, Delta Rebar.  Ms. Peden spoke to Mr. Edgar Santiago at Delta Rebar on December 19, 2025.

She learned that Delta did not require a 50% pre-payment as falsely represented by Whitney. She also learned that the full cost of the materials was $5996.24, much less than the $30,308 represented by Whitney in invoice 20. Finally, she learned that although the Pedens had paid Whitney $15,000 to be paid to Delta, Whitney never paid Delta's invoice. Whitney kept Delta's payments as well.

**G.    Whitney Refused to Provide An Accounting And Continues to Demand Money**

38.    On November 6, 2025, after discovering nonpayment to third parties, the Pedens and Whitney homes had a two hour call. In advance of the call, Whitney sent the Pedens a demand for an additional payment in the amount of $23,062, of which he was "willing to accept 50% payment at this time to move this project forward . . ." Whitney again failed to disclose to the Pedens that he held nearly $100,000 of their funds that were specifically earmarked to pay third parties and materials, but for which Whitney had simply kept the funds. The Pedens refused to pay the demand money and instead used the call to discuss Whitney's non-payment to third parties. By the end of the call, Whitney agreed that the Pedens would not be required to pay any further advanced funds. He also agreed to pay the outstanding invoices to Hogan, RGH and Cordova Concrete within a week. He did not.

39.    On November 10, 2025, the Pedens, invoking California Business and Professions Code § 7108, formally demanded that Whitney Homes provide a comprehensive accounting of all project funds received and expended. Specifically, the demand required the accounting to be delivered within two weeks and to include all third-party invoices, clearly indicating which ones had been paid and identifying all outstanding balances. Whitney refused to provide the requested accounting.

40.    The Pedens also demanded Whitney provide a list of all the sub-of all sub-contractors and material suppliers he hired to work on the project so they could take measures to ensure payment and reduce the risk of mechanics liens. Whitney refused to provide the list.

41.    Rather than confessing to the Pedens that he had misappropriated construction funds, Whitney escalated his fraudulent behavior. On November 11, he demanded payment for additional change orders, threatening to "put your project on hold" if they failed to approve change orders and pay the related invoices in advance of the work being performed.

42.    At all times to the present, and despite several written demands, Whitney refuses to provide

an accounting, will not itemize how funds were used, will not show proof of material purchases, and will not account for the location of the funds he failed to pay third parties.

43.    In response to the Pedens' demand for full disclosure, Whitney has only cited one reason for his failure to comply:  he "disagrees" with the Pedens' position.  At one point, when Ms. Peden demanded an accounting and insisted that Whitney use the money as directed to pay third party suppliers, Whitney responded that he will not let a client tell him how to conduct business.  Whitney assured the Pedens, that in his view, the way he has conducted the finances for their project is normal for him, and " is the way he does business." Whitney admits that soliciting large advance draws and failing to pay third-party vendors from owner funds is his regular, routine business model rather than an isolated incident.

44.    Whitney's website and marketing materials state that he is an active contractor with many projects and many homeowner clients, all engaged in a similar manner, supporting an inference that he has used similar fraudulent practices, including mail and wire communications, with other homeowners beyond the Pedens.

**H.    Termination And Demand for Return of Funds**

45.    On December 3, 2025, the Pedens terminated Whitney in writing. They also revoked approval for all outstanding change orders for work not yet finished. The Pedens demanded the return of all funds and outstanding invoices, informing Whitney that the Pedens, not Whitney, would be responsible for dispersing the money as necessary.

46.    Whitney was terminated before work could begin in earnest on the retaining wall. Sonoma County did not issue the necessary building permits until late November 2025, and no work on the retaining wall had commenced when the Pedens terminated Whitney.

47.    Despite repeated demands, Whitney has refused to return money advanced for materials on a retaining wall he would not build.  Whitney has completely ignored the Pedens' inquiries about when and how to pick up a check for the money he is wrongfully withholding.

48.    Whitney repeatedly refused to explain why he believed he could retain all amounts paid regardless of actual expenditures or payments to third parties, responding only that the parties disagreed, and he has provided no accounting, returned no funds, and paid none of the outstanding

third-party vendors.

49.    As a result of Whitney's conduct, the Pedens have suffered loss of the $65,000 in draw payments that were never used for materials or project work and loss of all payments made for third-party services that were diverted and never paid to vendors in the amount of $28,840.

50.    The Pedens have also incurred additional costs for replacement contractors, delay damages, financing costs associated with the prolonged project disruption, and exposure to mechanics lien risks created by unpaid third parties despite the Pedens having paid Whitney for those services.  The Pedens have also incurred litigation fees and costs.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

(Diversion of Construction Funds – Penal Code § 484b)

51.    Plaintiffs incorporate by reference paragraphs 1 through 50 as though fully set forth here.

52.    The Pedens paid Whitney $65,000 in draw funds and additional amounts on third-party invoices for the specific purpose of obtaining or paying for services, labor, materials, and equipment for their home improvement project.

53.    The Pedens paid Whitney $30,390 for specified purposes–to pay third-party invoices for services, labor, materials, and equipment for their home improvement project.

54.    Whitney willfully failed to apply these funds to their intended purposes because he did not use the $65,000 to purchase project materials, did not pay third-party vendors from the payments received specifically for that purpose.  Instead, Whitney diverted the funds to other uses for his personal benefit.

55.    Whitney has kept $28,840 of the money the Pedens gave him for the specific purpose of paying third party vendors and suppliers.  These funds have been diverted by Whitney for his personal benefit.

56.    Whitney's conduct constitutes a violation of Penal Code § 484b, which criminalizes receiving money for construction purposes and willfully failing to apply the funds to those purposes by failing to complete improvements or pay for services, labor, materials, or equipment.

57.    Whitney's violation demonstrates intentional wrongdoing, provides a basis for punitive and

exemplary relief, supports claims for restitution and disgorgement, and constitutes negligence per se and/or a violation of public policy.

58.    The Pedens are entitled to full restitution of all diverted funds, punitive damages based on intentional diversion of construction funds, and all other damages appropriate as a consequence of the violation of § 484b, in an amount to be proven at trial but not less than $93,840.

### SECOND CAUSE OF ACTION

#### (Fraud – Intentional Misrepresentation)

59.    Plaintiffs incorporate by reference paragraphs 1 through 58 as though fully set forth here.

60.    Whitney materially misrepresented that the advance draws were necessary and would be used exclusively to purchase project materials, that payments for third-party invoices would be used to pay those third parties, that those providers had been or would be paid from the Pedens' funds, and that additional prepayments were required solely because third parties suddenly demanded prepayment.

61.    At the time of these representations, Whitney knew they were false or made them with reckless disregard for their truth because he did not intend to purchase the promised materials or apply funds to the project and knew he either would not pay or was not paying third parties from the funds received.  Whitney has admitted that, as a regular business practice, he diverts construction funds collected from clients, failing to use them for the specific purpose for which they were received.

62.    Whitney actively concealed nonpayment to third parties when the Pedens complained about delays by blaming third parties and demanding further prepayments instead of disclosing that he had not paid them from earlier funds.

63.    Whitney intended that the Pedens rely on these misrepresentations so they would hire him to do the work, pay the $65,000, approve change orders, make payments for third-party services, continue allowing him to control project funds and vendor relationships, and refrain from discovering the nonpayment.

64.    The Pedens reasonably relied on Whitney's misrepresentations because they were not construction professionals, had no way to independently verify use of the $65,000 or payment of third parties, and reasonably believed the invoices and representations were legitimate until they later

contacted third parties themselves.

65.    Had the Pedens known that Whitney would not purchase materials or pay third parties, they would not have approved change orders, made payments, or continued the relationship, and their reliance caused them to suffer compensatory and consequential damages in an amount to be proven at trial but not less than $93,840.

66.    Because Whitney's conduct was intentional, deliberate, calculated, malicious, and demonstrated a reckless disregard for the Pedens' financial welfare and rights, and because he knowingly violated the California statutes governing his use of funds, the Pedens are entitled to an award of punitive damages, as well as attorneys'fees and costs of suit.

**THIRD CAUSE OF ACTION**

(Fraudulent Concealment / Nondisclosure)

67.    Plaintiffs incorporate by reference paragraphs 1 through 66 as though fully set forth here.

68.    Whitney had a duty to disclose to the Pedens that third-party service providers were not being paid despite receipt of funds for their invoices, that nonpayment was the true reason for the providers' refusal to continue work, that he had retained the $65,000 without purchasing materials or performing promised work, and the true status and application of all funds received.

69.    This duty arose from Whitney's partial representations about fund usage, his superior knowledge of payment status and fund application, the fiduciary-like relationship between homeowner and licensed contractor, and California's statutory home improvement regime requiring transparency in contractor-homeowner transactions.

70.    Whitney Homes actively concealed material facts from the Pedens. This concealment involved several deceptive acts:

- *Failing to Disclose Nonpayment*: Whitney concealed his failure to pay third parties.
- *Misattributing Prepayment Demands*: Whitney falsely blamed the third parties for demanding prepayment, concealing that the true reason was his own nonpayment.
- Refusing Accountability: When directly asked, Whitney refused to provide an accounting of the funds thereby concealing his wrongful conversion of the funds;
- *Avoiding Discussion of Provider Refusals*: Whitney concealed from the Pedens the reason why specific service providers were refusing to work on the project.
- *Concealed Misuse of Funds*: Whitney continued to demand additional money from the Pedens while hiding that he had kept all prior funds and failed to distribute them to third parties, despite stating this as the reason for collecting the money.

71.     The Pedens relied on this concealment and incomplete disclosures by continuing to approve change orders, making additional payments, delaying termination of the relationship, and continuing to believe Whitney was acting in good faith.

72.     Had the Pedens known that third parties had not been paid, that materials had not been purchased, and that Whitney was retaining funds without accountability, they would have terminated the arrangement and demanded restitution, and they would not have suffered damages in an amount to be proven at trial but not less than $93,840.

73.     Whitney's deliberate concealment and refusal to account demonstrate intentional and malicious conduct warranting punitive damages, attorneys fees and costs of suit.

### FOURTH CAUSE OF ACTION

(Statutory Fraud – Business and Professions Code § 7160)

74.     Plaintiffs incorporate by reference paragraphs 1 through 73 as though fully set forth here.

75.     Whitney is, and at all relevant times was, a licensed general contractor in California and a person required to be licensed under the Contractors' State License Law who offered and performed a work of improvement, including home improvement services, on Plaintiffs' residence.

76.     Plaintiffs were induced to work with Whitney for a work of improvement and to authorize and fund the construction phase of their retaining wall project in reliance on Whitney's false and fraudulent representations and knowingly false statements, including but not limited to: (a) that Whitney would use advance "draw" payments to purchase project materials and pay legitimate construction expenses for Plaintiffs' project; (b) that monies paid on third-party invoices would be promptly paid over to the identified vendors and subcontractors; (c) that additional advance payments were required only because third-party providers demanded prepayment; and (d) that Whitney would provide transparent invoicing and timely pay all expenses incurred for the project.

77.     At the time he made these representations and statements, Whitney knew they were false, or made them recklessly and without regard for their truth, because he did not intend to apply Plaintiffs' funds to pay the represented third parties or to purchase the promised materials, in fact diverted those funds to his own purposes, and later admitted that soliciting advance draws and failing to pay third-party vendors from owner funds is his regular business practice.

78.    Plaintiffs reasonably relied on Whitney's false and fraudulent representations and knowingly false statements in deciding to proceed with Whitney as their contractor despite the absence of a comprehensive written home improvement contract, to approve change orders and authorize incremental work, to pay the 65,000 dollars in "draws," and to pay 30,390 dollars on third-party invoices, rather than terminating Whitney or hiring a different contractor

79.    As a direct and proximate result of being induced to contract for a work of improvement in reliance on Whitney's knowingly false and fraudulent representations, Plaintiffs have suffered damages and injury, including but not limited to: loss of the 65,000 dollars in draw payments that were never used for materials or project work; loss of at least 28,840 dollars in funds paid for third-party services that were diverted and never paid to vendors; additional costs for replacement contractors; delay damages; financing and carrying costs; and exposure to and expenses associated with mechanics lien risk, in an amount to be proven at trial but not less than 93,840 dollars.

80.    Plaintiffs are entitled to recover from Whitney a statutory penalty, reasonable attorney's fees, and all damages they sustained by reason of the false and fraudulent representations and knowingly false statements that induced them to contract for the work of improvement, in addition to restitution, disgorgement, and such further relief as the Court deems proper.

### FIFTH CAUSE OF ACTION

(Violation of Consumers Legal Remedies Act – Civil Code § 1750 et seq.)

81.    Plaintiffs incorporate by reference paragraphs 1 through 80 as though fully set forth here.

82.    Plaintiffs are "consumers" within the meaning of Civil Code section 1761(d) because they sought and acquired home improvement services for personal, family, or household purposes related to their Sonoma County home.

83.    Whitney, doing business as Whitney Homes, is a "person" within the meaning of Civil Code section 1761(c) and was engaged in transactions intended to result, and which did result, in the sale and provision of "services" to Plaintiffs, as defined in Civil Code section 1761(b).

84.    In connection with these consumer transactions, Whitney engaged in unfair and deceptive acts and practices declared unlawful by the Consumers Legal Remedies Act, Civil Code section 1770(a), including, without limitation: (a) representing that services had characteristics, uses, or benefits that

they did not have, in violation of section 1770(a)(5); (b) representing that services were of a particular standard, quality, or grade when they were of another, in violation of section 1770(a)(7); (c) advertising services with the intent not to sell them as advertised, in violation of section 1770(a)(9); and (d) representing that a transaction conferred or involved rights, remedies, or obligations which it did not have or involve, or which were prohibited by law, in violation of section 1770(a)(14).

85.     These unlawful practices include, but are not limited to, Whitney's conduct in: falsely representing that advance draw payments would be used to purchase materials and pay legitimate construction expenses for Plaintiffs' project; falsely representing that third-party invoices would be and had been paid out of Plaintiffs' funds; concealing that he had not paid RGH, Hogan Land Services, Cordoza Concrete, or Delta Rebar despite collecting funds earmarked for them; misrepresenting that third parties required prepayment when in fact his own nonpayment was the reason for any demands; and falsely implying that Plaintiffs' funds were being held and disbursed in compliance with California contractor laws when they were being diverted for his own purposes.

86.     Whitney's misrepresentations and omissions were material to Plaintiffs' decision to engage and retain Whitney for the project, to approve change orders, and to make the challenged payments, and Plaintiffs reasonably and justifiably relied on those misrepresentations and omissions in entering into and continuing the transactions with Whitney.

87.     On December 3, 2025, the Pedens provided Whitney written notice of his violations, and demanded return of the misappropriated funds.  Whitney did not return the unlawfully held funds.

88.     As a direct and proximate result of these CLRA violations, Plaintiffs have suffered damage as a result of Whitney's unlawful practices, including but not limited to: loss of the 65,000 dollars in draw payments; loss of at least 28,840 dollars in diverted third-party payments; additional costs for replacement contractors and corrective work; delay and disruption damages; increased financing and carrying costs; and exposure to and expenses associated with mechanics lien risks, all in an amount to be proven at trial but not less than 93,840 dollars.

89.     Plaintiffs seek all remedies available under the CLRA, including: actual damages; enhanced remedies for senior consumers; restitution of all monies wrongfully obtained from them; injunctive relief prohibiting Whitney from continuing to engage in the unlawful and deceptive practices alleged

herein; punitive damages; and reasonable attorney's fees and costs.

## SIXTH CAUSE OF ACTION

### (Unfair Business Practices – Business and Professions Code § 17200 et seq.)

90.    Plaintiffs incorporate by reference paragraphs 1 through 89 as though fully set forth here.

91.    Whitney has engaged in unlawful, unfair, and fraudulent business acts and practices in violation of California's Unfair Competition Law, Business and Professions Code section 17200 et seq., in connection with his provision of home improvement and construction services to Plaintiffs and other homeowners.

92.    Whitney's acts and practices are unlawful because they constitute, among other things: (a) statutory fraud under Business and Professions Code section 7160; (b) violations of the Consumers Legal Remedies Act, Civil Code section 1750 et seq.; (c) diversion of construction funds in violation of Penal Code section 484b; and (d) violations of the Contractors' State License Law and related regulations governing handling of client funds and transparency in contractor-homeowner transactions.

93.    Whitney's acts and practices are unfair because they offend established public policies embodied in California consumer protection and contractor licensing statutes, are unethical, oppressive, unscrupulous, and substantially injurious to consumers, and the harm to Plaintiffs and other homeowners from the diversion of construction funds, nonpayment of suppliers and subcontractors, and concealment of fund usage outweighs any purported justification or benefit.

94.    Whitney's acts and practices are fraudulent within the meaning of the UCL because they are likely to deceive reasonable consumers: Whitney uniformly represents that he will use owner funds to pay identified third-party vendors, that draw payments will be applied to materials and legitimate project expenses, that he maintains transparent and trustworthy billing practices, while in fact diverting funds, concealing nonpayment, refusing to provide an accounting or return unearned funds.

95.    As a direct and proximate result of Whitney's unlawful, unfair, and fraudulent business acts and practices, Plaintiffs have suffered economic injury in fact and lost money, including but not limited to: the 65,000 dollars in draw payments never applied to materials or project work; at least 28,840 dollars in payments earmarked for third-party vendors that were diverted and never paid;

additional out-of-pocket costs for replacement contractors, delay, and financing; and the costs of addressing lien exposures and reputational harms with vendors, all in an amount to be proven at trial but not less than 93,840 dollars.

96.    Plaintiffs are entitled to restitution and disgorgement of all money wrongfully obtained and retained by Whitney from Plaintiffs as a result of his unfair competition; injunctive relief prohibiting Whitney from engaging in the unlawful, unfair, and fraudulent practices alleged herein and requiring him to implement lawful accounting and payment practices; and recovery of their reasonable attorney's fees and costs where authorized by statute or common-fund principles.

### SEVENTH CAUSE OF ACTION

(Civil RICO – 18 U.S.C. § 1962(c), Mail and Wire Fraud)

97.    Plaintiffs incorporate by reference paragraphs 1 through 96 as though fully set forth here.

98.    This cause of action is brought under RICO, 18 U.S.C. §§ 1961-1964, including § 1962(c), and Plaintiffs seek treble damages, costs, and reasonable attorney's fees under 18 U.S.C. § 1964(c).

99.    Defendant Mark Whitney is a "person" within the meaning of 18 U.S.C. § 1961(3), and at all relevant times he conducted and participated in the affairs of an "enterprise" within the meaning of § 1961(4), consisting of himself, James Gaydos, and employees or agents acting in concert with Whitney and Gaydos.  Whitney and others associated in fact to obtain money from homeowners through fraudulent home-improvement and construction schemes.

100.    The enterprise engaged in and its activities affected interstate commerce, including use of interstate wire and mail systems to solicit clients, transmit invoices, receive payments, and purchase materials and services.

101.    Whitney, through Whitney Homes, devised and carried out a scheme to defraud Plaintiffs and other homeowners by falsely representing that funds paid for third-party invoices would be used to pay those providers and that funds paid through draws, including the $65,000 in draws, would be used exclusively to purchase materials and pay legitimate construction expenses, when he instead intended to divert substantial portions of those funds for his own purposes.

102.    In furtherance of this scheme, Whitney used interstate wires and the United States mail to obtain money from Plaintiffs and lull them into continuing to pay, including sending invoices

electronically, instructing Plaintiffs to wire funds directly to his account, accepting wired funds and mailed checks, and sending additional electronic and mailed communications falsely suggesting that third parties had been or would be paid while concealing diversion of funds.

103.    Each wire transfer initiated by Plaintiffs at Whitney's direction and each check mailed to Whitney in reliance on false invoices and representations constitutes a separate act of wire or mail fraud under 18 U.S.C. §§ 1341 and 1343.

104.    The predicate wire and mail fraud acts constitute "racketeering activity" under 18 U.S.C. § 1961(1), and Whitney has committed at least two such acts within ten years, including multiple fraudulent wires and mailings associated with the $65,000 draws and third-party invoices.

105.    Whitney admitted that "this is the way he does business," and his marketing to many homeowner clients supports a reasonable inference that he has used similar fraudulent practices with other homeowners, including demanding substantial draws and third-party payments, using email, text, and mail to transmit invoices and payment instructions, receiving wired funds and mailed checks, failing to pay third-party providers, diverting funds, and concealing nonpayment while demanding additional funds.

106.    These acts are related, share the common purpose of wrongfully extracting money from homeowners, involve similar victims and methods, and pose a continuing threat of repetition given Whitney's admission and ongoing marketing, and therefore constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

107.    Whitney conducted and participated, directly and indirectly, in the conduct of the enterprise's affairs through this pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), and the racketeering acts were integral to the way he operated his contracting business.

108.    As a direct and proximate result of Whitney's RICO violations, Plaintiffs have been injured in their business or property by losing the $65,000 in draws never used for project materials, losing all funds wired or mailed for third-party invoices that were diverted and never paid to vendors, and incurring additional consequential losses associated with project delay, replacement contractors, and lien exposure.

109.    Plaintiffs are entitled to recover treble the amount of their actual damages, as well as costs of

suit and reasonable attorney's fees, pursuant to 18 U.S.C. § 1964(c).

### EIGHTH CAUSE OF ACTION

(Money Had and Received / Unjust Enrichment)

110.    Plaintiffs incorporate by reference paragraphs 1 through 109 as though fully set forth here.

111.    Whitney received $93,840 in advance draw payments for materials and all amounts paid on invoices for third-party services for the express purpose of applying those funds to the project and paying specified providers.

112.    Whitney failed to provide equivalent value because the money was not spent on project materials, the project remains incomplete with no materials purchased, third-party invoices were not paid to identified vendors, and no construction work was performed that justifies retention of those sums.

113.    The Pedens' revocation of all change order approvals for work not yet completed confirms that no further value is owed for these advance payments, and in equity and good conscience Whitney should not retain funds he did not earn and did not apply to their intended purposes.

114.    The Pedens are entitled to restitution of all misapplied and diverted funds, plus pre-judgment and post-judgment interest from the date of each payment, in an amount to be proven at trial but not less than 93,840.

### NINTH CAUSE OF ACTION

(Declaratory Relief and Restitution)

115.    Plaintiffs incorporate by reference paragraphs 1 through 114 as though fully set forth here.

116.    The change orders approving construction work and directing additional payments were induced by Whitney's fraudulent misrepresentations and concealment regarding fund usage and payment status of third parties, and the Pedens would not have approved them had they known the true facts.

117.    The change orders arose in an illegal, non-compliant home improvement contracting framework that violated Business and Professions Code §§ 7159, 7159.5, and 7159.6, and cannot serve as a valid basis for enforcing payment obligations against the Pedens.

118.    The invoices paid were induced by Whitney's fraudulent misrepresentations that he would use

the money to pay the third-parties named on the invoice, and for which payment was provided. The Pedens would not have paid the invoices had they known the true facts.

119.    The Pedens have given Whitney written notice revoking all change order approvals for work not yet completed, and demanding return of money paid in connection with the fraudulent invoices, effective upon discovery of the fraud.

120.    The Pedens seek declarations that all change orders are rescinded and unenforceable, that they owe no further sums to Whitney under any change order, and that they are entitled to restitution of all money paid in connection with the fraudulent invoices, as set forth in the other causes of action.

**PRAYER FOR RELIEF**

121.    WHEREFORE, Plaintiffs Tim Peden and Patricia Peden pray for judgment against Defendant Mark Whitney, doing business as Whitney Homes, as follows:

1.    For compensatory damages, including but not limited to the full draw payments, all amounts paid for third-party services that were diverted and never paid to vendors, and all consequential damages, in an amount to be proven at trial but not less than 93,840 dollars.

2.    For restitution and disgorgement of all funds wrongfully obtained or retained by Defendant to be proven at trial but not less than 93,840 dollars.

3.    For statutory damages, attorney's fees, and costs for violations of Business and Professions Code § 7160 and other applicable statutes.

4.    For treble damages, costs of suit, and reasonable attorney's fees under 18 U.S.C. § 1964(c) for Defendant's RICO violations.

5.    For punitive and exemplary damages under Civil Code § 3294 and any other applicable authority, in an amount sufficient to punish and deter Defendant's wrongful conduct.

6.    For declaratory relief rescinding the change orders and declaring that Plaintiffs owe no further sums to Defendant under any such change orders and are entitled to restitution of payments made in reliance on fraudulent invoices.

7.    For injunctive relief requiring Whitney to deposit 93,840 dollars into an escrow account pending the outcome of this lawsuit.

8.    For pre-judgment and post-judgment interest as allowed by law.

9.    For costs of suit incurred herein.

10.    For such other legal and equitable relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

122.    Plaintiffs demand a trial by jury on all issues so triable.

Date:  January 2, 2026                    Respectfully submitted,

                                          /s/ *Patricia L. Peden*
                                          Patricia L. Peden
                                          2261 Market Street, No. 606
                                          San Francisco, California, 94114

                                          *Attorney for Plaintiffs*